UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
RENE AVILES-GUZMAN,

                Plaintiff,

        - against -

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
19-CV-5043 (PKC)

PAMELA K. CHEN, United States District Judge:

Plaintiff Rene Aviles-Guzman brings this action under 42 U.S.C. § 405(g), seeking judicial review of the decision by the Commissioner of the Social Security Administration ("SSA") denying his claim for Social Security Disability Insurance Benefits ("DIB"). Before the Court are the parties' cross-motions for judgment on the pleadings. (Dkts. 8, 11.) Plaintiff seeks an order vacating the Commissioner's decision and remanding for further administrative proceedings. The Commissioner asks the Court to affirm the denial of Plaintiff's claim. For the reasons that follow, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. This case is remanded for further proceedings consistent with this Memorandum and Order.

## BACKGROUND

### I. Procedural History

On June 25, 2018, Plaintiff filed an application for DIB, alleging disability beginning on June 22, 2018. (Administrative Transcript ("Tr."),[1] Dkt. 7, at 59–60, 164–67.) On August 30,

---

[1] Page references prefaced by "Tr." refer to the continuous pagination of the Administrative Transcript (appearing in the lower right corner of each page) and not to the internal pagination of the constituent documents or the pagination generated by the Court's CM/ECF docketing system.

2018, Plaintiff's application was initially denied. (Tr. 72–77.) On October 17, 2018, Plaintiff filed

a request for a hearing before an administrative law judge ("ALJ"). (Tr. 78–79.) On February 26,

2019, Plaintiff appeared with counsel before ALJ Patrick Kilgannon. (Tr. 36–58.) In a decision

dated April 3, 2019, the ALJ determined that Plaintiff was not disabled under the Social Security

Act (the "Act"), and was therefore not eligible for DIB. (Tr. 18–32.) On July 17, 2019, the ALJ's

decision became final when the Appeals Council of the SSA's Office of Appellate Operations

denied Plaintiff's request for review of the ALJ decision. (Tr. 1–6.) Thereafter, Plaintiff timely[2]

commenced this action.

## II.     The ALJ Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant

bears the burden of proof in the first four steps of the inquiry; the Commissioner bears the burden

at the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citation omitted). First,

the ALJ determines whether the claimant is currently engaged in "substantial gainful activity." 20

C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the claimant is not disabled. *Id.* If the answer is

no, the ALJ proceeds to the second step to determine whether the claimant suffers from a severe

---

[2] Title 42, United States Code, Section 405(g) provides that

> [a]ny individual, after any final decision of the Commissioner of Social Security
> made after a hearing to which he was a party, . . . may obtain a review of such
> decision by a civil action commenced within sixty days after the mailing to him of
> notice of such decision or within such further time as the Commissioner of Social
> Security may allow.

42 U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is
presumed received five days after it is dated unless the claimant makes a reasonable showing to
the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at
*3 (E.D.N.Y. Mar. 27, 2015) (citing, *inter alia*, 20 C.F.R. §§ 404.981, 422.210(c)). Applying this
standard, the Court determines that Plaintiff received the Commissioner's final decision on July
22, 2019. Because Plaintiff filed the instant action on September 5, 2019—45 days later—it is
timely. (*See generally* Complaint, Dkt. 1.)

impairment. *Id.* § 404.1520(a)(4)(ii). An impairment is severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id.* § 404.1520(c). If the claimant's impairment is not severe, then the claimant is not disabled. However, if the impairment is severe, the ALJ proceeds to the third step, and considers whether the impairment meets or equals one of the impairments listed in the Act's regulations (the "Listings"). *Id.* § 404.1520(a)(4)(iii); *see also id.* pt. 404, subpt. P, app. 1. If the ALJ determines at step three that the claimant has one of the listed impairments, then the ALJ will find that the claimant is disabled under the Act. On the other hand, if the claimant does not have a listed impairment, the ALJ must determine the claimant's residual functional capacity ("RFC") before continuing on to steps four and five. To determine the claimant's RFC, the ALJ must consider the claimant's "impairment(s), and any related symptoms, . . . [that] may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.* § 404.1545(a)(1). The ALJ will then use the RFC determination in step four to determine if the claimant can perform past relevant work. *Id.* § 404.1520(a)(4)(iv). If the answer is yes, the claimant is not disabled. Otherwise, the ALJ will proceed to step five and determine whether the claimant, given the claimant's RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy. *Id.* § 404.1520(a)(4)(v). If the answer is yes, the claimant is not disabled; otherwise, the claimant is disabled and is entitled to benefits. *Id.*

In this case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 22, 2018, his alleged onset date, and that he suffered from the following severe impairments: post-traumatic stress disorder ("PTSD"), major depressive disorder ("MDD"), and lumbar spine degenerative disc disease. (Tr. 23.) The ALJ then proceeded to the third step and determined that Plaintiff's severe impairments did not meet or medically equal the severity of one

of the impairments in the Listings.  (Tr. 25–26.)  Moving to the fourth step, the ALJ found that

Plaintiff maintained the RFC

> to perform medium work[3] as defined in 20 CFR 404.1567(c) except [that he] should
> avoid hazards such as unprotected heights and moving machinery, with work
> limited to unskilled tasks, defined by the dictionary of occupational titles as being
> SVP 1 or 2, in a low stress job, defined as having only occasional decision making
> and occasional changes in the work setting, with only occasional interaction with
> supervisors, coworkers and the public.

(Tr. 26–27.)  Based upon the RFC finding, the ALJ determined that Plaintiff was "capable of

performing past relevant work as a mail clerk," as this work "does not require the performance of

work-related activities precluded by the claimant's [RFC]." (Tr. 31 (citations omitted).)  The ALJ

accordingly concluded that Plaintiff was not disabled.  (Tr. 32.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Act may bring an action in federal

district court seeking judicial review of the Commissioner's denial of their benefits.  42 U.S.C.

§ 405(g).  In reviewing a final decision of the Commissioner, the Court's role is "limited to

determining whether the SSA's conclusions were supported by substantial evidence in the record

and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (internal quotation

omitted).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d

409, 417 (2d Cir. 2013) (per curiam) (internal quotation and alterations omitted).  In determining

whether the Commissioner's findings were based upon substantial evidence, "the reviewing court

is required to examine the entire record, including contradictory evidence and evidence from which

---

[3] According to the applicable regulations, "[m]edium work involves lifting no more than
50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20
C.F.R. § 404.1567(c).

4

conflicting inferences can be drawn." *Id.* (citation omitted).  If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld.  42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76, 178 n.3 (2d Cir. 2013) (per curiam) ("An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [the court] to glean the rationale of an ALJ's decision [.]" (internal quotation omitted)).  Ultimately, the reviewing court "defer[s] to the Commissioner's resolution of conflicting evidence," *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted), and, "[i]f evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld," *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (citation omitted).

## DISCUSSION

Plaintiff argues that the ALJ's decision was not supported by substantial evidence.  (Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl.'s Mem."), Dkt. 9, at 1.)  Specifically, Plaintiff argues that: (1) the ALJ improperly evaluated Plaintiff's mental impairments;[4] and (2) the ALJ erred in his RFC determination by failing to appropriately weigh medical opinion evidence and improperly evaluating Plaintiff's credibility.  (Tr. 18, 23–24.)  The Court agrees, and finds remand warranted on these grounds.  The following discussion proceeds in accordance with the ALJ's requisite five-step inquiry.

---

[4] With respect to physical limitations, the ALJ found that Plaintiff had severe lumbar spine degenerative disc disease, but noted that all other impairments of record "including, but not limited to[,] alcohol use disorder, traumatic brain injury, borderline echogenic liver, sleep apnea, right foot impairment, irritable bowel syndrome, bilateral cataracts, bursitis of the right hip[,] and obesity are non-severe." (Tr. 23, 25.)  Because Plaintiff argues only that the ALJ did not properly evaluate the severity of his mental health limitations (*see* Pl.'s Mem., Dkt. 9, at 18) and the Court finds remand warranted on that basis, the Court does not discuss Plaintiff's physical limitations.

## I.     The ALJ's Decision at Step Three

At step three of the inquiry, an ALJ considers whether any severe impairment suffered by the claimant meets or medically equals the severity of an impairment in the Listings. 20 C.F.R. § 404.1520(a)(4)(iii); *see also id.* pt. 404, subpt. P, app. 1. Each Listing sets out "the objective medical and other findings needed to satisfy the criteria of that listing." *Id.* §§ 404.1525(c)(3). A plaintiff seeking to establish that his impairments meet or equal the severity of an impairment in the Listings must establish that he "satisfies all of the criteria of that listing, including any relevant criteria in the introduction." *Id.* § 404.1525(c)(3); *accord Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). An ALJ is not necessarily required to set out why a claimant has not met the requirements of a Listing, so long as "other portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence." *McIntosh v. Berryhill*, No. 17-CV-5403 (ER) (DF), 2018 WL 4376417, at *22 (S.D.N.Y. July 16, 2018) (quoting *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982)), *report and recommendation adopted*, 2018 WL 4374001 (S.D.N.Y. Sept. 12, 2018). A plaintiff bears the burden to "demonstrate that [his] disability [meets] all of the specified medical criteria of a [] disorder." *Id.* at *18 (alterations in original) (quoting *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 888 (2d Cir. 2007) (summary order)).

### A.     Listings 12.04 and 12.15 – Mental Impairments

Listings 12.04 and 12.15 require medical documentation of the relevant impairments pursuant to each Listing's paragraph A, and the fulfilment of the criteria under each Listing's paragraph B or paragraph C. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 12.04, 12.15. Listing 12.04 applies to depressive, bipolar, and other related disorders. *Id.* pt. 404, subpt. P, app. 1, sec. 12.04. As relevant to depressive disorders, paragraph A of Listing 12.04 requires medical

6

documentation of five or more of the following: depressed mood; diminished interest in almost all activities; appetite disturbance with change in weight; sleep disturbance; observable psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; or thoughts of death or suicide. *Id.* pt. 404, subpt. P, app. 1, sec. 12.04(A)(1). Listing 12.15 applies to trauma- and stressor-related disorders, and its paragraph A requires medical documentation of all of the following: exposure to actual or threatened death, serious injury, or violence; subsequent involuntary re-experiencing of the traumatic events; avoidance of external reminders of the event; disturbance in mood and behavior; and increases in arousal and reactivity. *See id.* pt. 404, subpt. P, app. 1, sec. 12.15(A).

Paragraph B of Listings 12.04 and 12.15 requires the demonstration of extreme limitation[5] of one, or marked limitation[6] of two, of the following areas of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. *See id.* pt. 404, subpt. P, app. 1, sec. 12.04(B), 12.15(B) (internal cross-references omitted). Paragraph C of Listings 12.04 and 12.15 requires the demonstration of a mental disorder that is serious and persistent—that is, a medically documented history of the existence of the disorder over a period of at least 2 years—and

> evidence of both: (1) [m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [the claimant's] mental disorder; and (2) [m]arginal adjustment, that is, [the claimant has] minimal capacity to adapt to changes in [their] environment or to demands that are not already part of [their] daily life.

---

[5] A claimant has an "[e]xtreme limitation" in an area when they "are not able to function in th[e] area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 12.00(F)(2)(e).

[6] A claimant has a "[m]arked limitation" in an area when their "functioning in th[e] area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 12.00(F)(2)(d).

*Id.* pt. 404, subpt. P, app. 1, sec. 12.04(C), 12.15(C) (internal cross-references omitted).

### B.     The ALJ's Step-Three Analysis

In considering the severity of Plaintiff's PTSD and MDD, the ALJ concluded that "[Plaintiff]'s mental impairments, considered singly and in combination, d[id] not meet or medically equal the criteria of [L]istings 12.04 and 12.15." (Tr. 25.)  Reviewing the paragraph B criteria, the ALJ found that Plaintiff had mild limitations[7] in understanding, remembering, or applying information; moderate limitations[8] in interacting with others; mild limitations in concentrating, persisting, or maintaining pace; and moderate limitations in adapting or managing himself.  (Tr. 25–26.)  In the absence of "at least two 'marked' limitations or one 'extreme' limitation" in those categories, the ALJ concluded that the paragraph B criteria were not satisfied for either Plaintiff's PTSD or MDD.  (Tr. 26.)  In arriving at this conclusion, the ALJ cited Plaintiff's function report from July 30, 2018 (Tr. 25–26; *see* Tr. 202–09), the August 15, 2018 treatment notes of psychological consultative examiner ("CE") Paul S. Herman, Ph.D. (Tr. 26; *see* Tr. 259–62) and of medical CE Dulan Hailoo, M.D. (Tr. 26; *see* Tr. 263–67), outpatient hospital records from the Northport Veterans Affairs ("VA") Medical Clinic from September 1, 2016 to October 24, 2018 (Tr. 26; *see* Tr. 268–432, 548–973), and hospital records from November 6, 2018 to January 18, 2019 (Tr. 26; *see* Tr. 983–1029).  The ALJ further concluded that Plaintiff did not meet the criteria for paragraph C.[9]  (Tr. 26.)

---

[7] A claimant has a "[m]ild limitation" in an area when their "functioning in th[e] area independently, appropriately, effectively, and on a sustained basis is slightly limited." 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 12.00(F)(2)(b).

[8] A claimant has a "[m]oderate limitation" in an area when their "functioning in th[e] area independently, appropriately, effectively, and on a sustained basis is fair." 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 12.00(F)(2)(c).

[9] Plaintiff argues that the ALJ's determinations as to the paragraph B criteria are not supported by substantial evidence, but does not refute the ALJ's analysis of the paragraph C

### C.      The ALJ's Step-Three Determination Warrants Remand

Remand is appropriate with respect to an ALJ's "rationale in support of his decision to find or not to find a listed impairment" if the district court is "unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ." *Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 483 (S.D.N.Y. 2018) (quoting *Berry*, 675 F.2d at 469) (collecting cases); *see also Rivera v. Astrue*, No. 10-CV-4324 (RJD), 2012 WL 3614323, at *11–12 (E.D.N.Y. Aug. 21, 2012) (remanding for further administrative proceedings where the ALJ failed to proffer specific rationale for the plaintiff not having met the Listing requirements, and where the ALJ's rationale was not evident from the balance of the evidence).  The Court cannot find that the ALJ's step-three rationale is supported by substantial evidence.

In support of his severity finding as to Plaintiff's MDD and PTSD, the ALJ cited to Plaintiff's evaluation by CE Herman, but did not discuss the December 28, 2018 function assessment completed by Plaintiff's longstanding treating psychiatrist, Dr. Robert Vincent.  (*See* Tr. 25–26.)  In that Psychiatric/Psychological Impairment Questionnaire, Dr. Vincent diagnosed Plaintiff with chronic depression and PTSD, explained that Plaintiff began treatment in 2013, and noted that Plaintiff was undergoing treatment four to five days a week in a PTSD program, and was "at maximum improvement."  (Tr. 975.)  With respect to the paragraph B criteria, Dr. Vincent opined that Plaintiff was "markedly limited"[10] in several work-related activities within all four

---

criteria.  (*See* Pl.'s Mem., Dkt. 9, at 19.)  The Listings require fulfilment of the criteria in either paragraph B or paragraph C.  *See* 20 C.F.R. pt. 404, subpt. P, app. 1, sec. 12.04, 12.15.

[10] According to the rating scale, markedly limited is defined as "effectively preclud[ing] the individual from performing the activity in a meaningful manner."  (*See* Tr. 978.)

categories of mental functioning: understanding and memory;[11] sustained concentration and persistence;[12] social interactions;[13] and adaptation.[14]   (Tr. 978–80.)   CE Herman, in contrast, concluded in his assessment that Plaintiff had only "intermittent mild" limitations in understanding, remembering and applying information; "no evidence" of limitations in interacting adequately or maintaining wellbeing; and "intermittent mild to moderate" limitations in sustaining concentration and consistent pace, and regulating emotions.   (Tr. 261.)   With scant explanation, the ALJ deferred to the assessment of CE Herman over that of Dr. Vincent.   (Tr. 26.)

The Court finds this deference to CE Herman's assessment to be in error in light of Plaintiff's extensive treatment and medical history.   For context regarding Plaintiff's diagnoses, Plaintiff was in the U.S. Air Force for sixteen years.   He was deployed to Afghanistan for seven months in 2011, where "he saw people get shot and killed" and felt "guilty [after seeing someone get shot] because he did not react to help the man[, and] '[] just stood there and couldn't think.'" (Tr. 299.)   In September 2011, "an IDF[15] came through the roof of the building [Plaintiff] was in [and] [] exploded about 10 feet away from [him]."   (Tr. 300; *see also* Tr. 308 ("[Plaintiff] was in

---

[11]   Dr. Vincent indicated that Plaintiff was "markedly limited" in three work-related activities in this area.   (*See* Tr. 978.)

[12] Dr. Vincent indicated that Plaintiff was "markedly limited" in five work-related activities in this area.   (*See* Tr. 978–79.)

[13]   Dr. Vincent indicated that Plaintiff was "markedly limited" in one work-related activity in this area.   (*See* Tr. 979.)

[14]   Dr. Vincent indicated that Plaintiff was "markedly limited" in two work-related activities in this area.   (*See* Tr. 979–80.)

[15]   Based on the context of this statement, the Court assumes that "IDF" refers to an improvised explosive device, which were commonly used during the conflict in Afghanistan in 2011 when Plaintiff was stationed there.   *See, e.g.*, *In Afghanistan, Insurgents Let Bombs Do Fighting*, NEW YORK TIMES (Jan. 17, 2011), https://www.nytimes.com/2011/01/18/world/asia/18 helmand.html (last visited Feb. 17, 2020).

the nearby vicinity of an explosion secondary to a mortar attack.").)  After this blast, Plaintiff "report[ed] he sometime sees shadows or hears voices talking to him," which a provider explained "may be due to the trauma."  (Tr. 300.)

The Court finds that the ALJ's reasoning as to each of the four Paragraph B categories is undercut by the medical record and not supported by substantial evidence.  In determining that Plaintiff had no more than mild limitations in understanding, remembering, or applying information, the ALJ reasoned that, though Plaintiff had reported poor concentration and difficulty remembering, he was "able to pay bills, count change, watch movies, play bingo, drive and go out alone."  (Tr. 25.)  The ALJ further relied on Plaintiff's hospital records and hearing testimony— during which Plaintiff testified only as to his prior work experience—to conclude that Plaintiff "was able to provide information about his health and describe his prior work history."  (Tr. 26.)  However, a few instances of being able to recount his medical and occupational history does not rebut Plaintiff's general history of day-to-day memory issues, which are more likely to affect his employment prospects than the isolated instances of being able to remember his health and employment history upon which the ALJ relied.

For instance, on December 8, 2017, Plaintiff took a Cognitive Linguistic Quick Test, which assessed "five primary cognitive domains, including attention, executive function, memory, language, and visuospatial skills."  (Tr. 323.)  Plaintiff scored below normal limits in two specific task assessments: (1) auditory memory and comprehension, working memory, and language output skills; and (2) attention, complex visual scanning, motor agility and speed, working memory, planning, mental flexibility, and conceptualization.  (Tr. 324.)  Based on the results of the test, a physical medicine and rehabilitation physician recommended that Plaintiff attend therapy sessions to assist with his memory loss and difficulty in maintaining attention.  (Tr. 325.)  On February 22,

2018, Plaintiff underwent a speech pathology evaluation, and had difficulty implementing strategies for memory rehearsal and word-retrieval techniques. (Tr. 967.) During a separate speech pathology evaluation on March 19, 2018, Plaintiff stated that "he ha[d] difficulty remembering information his wife tells [] him." (Tr. 954.) On March 27, 2018, Plaintiff underwent a "neuropsychological evaluation due to a reported history of mild traumatic brain injury sustained in 2011 during his deployment to Afghanistan." (Tr. 307, 310.) During the consultation, Plaintiff explained that he was "forgetful,"[16] had been discharged from the Air Force due to PTSD, and "continues to experience symptoms of [PTSD]." (Tr. 308.) On August 3, 2018, Plaintiff "report[ed] having memory issues" for the preceding seven months. (Tr. 735.) "He report[ed] that he forgets names and what he did the day prior," and that he "use[d] a reminder to take his medications." (Id.) In a group counseling session on September 19, 2018, Plaintiff similarly "report[ed] his ongoing struggle with memory and the distress it causes him and his family." (Tr. 636.) Plaintiff has also reported that, due to his poor concentration, he has difficulty in following spoken or written instructions and has trouble remembering "names, directions, [and] dates." (Tr. 209.)[17]

Second, in concluding that Plaintiff had no more than moderate limitations in interacting with others, the ALJ reasoned that the medical evidence described Plaintiff as cooperative and

---

[16] Similarly, CE Herman found during his August 15, 2018 evaluation that Plaintiff's "remote memory skills" were "below-average." (Tr. 260.)

[17] Furthermore, the ALJ's cherry-picking of activities like paying the bills and watching movies ignores the limitations that Plaintiff made clear, such as needing reminders "to take care of [his] personal need[s], like get[ting] a haircut or shav[ing]." (Tr. 204.) What is more, "it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 238–39 (E.D.N.Y. 2014) (internal quotations and citations omitted).

"able to spend time with friends and family, deal appropriately with authority, and live with others." (Tr. 26.) However, Plaintiff has explained that he engages in social activities exclusively at the Psychosocial Rehabilitation and Recovery Center, the only place he "feel[s] safe"; otherwise, he has "no desire to be around others." (Tr. 202, 206–07.) Plaintiff has also reported that he has "problems with isolation": "I stay alone all the time. I don't want to be around anyone." (Tr. 300, 466.) On March 27, 2018, Plaintiff

> described his mood as oftentimes depressed, which he said has also been punctuated by the loss of servicemen who recently were killed in action during a helicopter incident in Iraq. He reported the experience of nightmares, and is easily provoked by various sounds or other stimuli that remind him of his deployment to Afghanistan.

(Tr. 308.) Treatment notes from June 2018 report that Plaintiff "spends most of his days in the garage. 'Sometimes [he] get[s] there at 7am and do[es not] leave until midnight.'" (Tr. 299.) "[H]e isolates at home [in] his garage for hours, but [] doing woodwork [was] very relaxing and 'helps [him] keep the bad thoughts away.'" (Tr. 856.) Plaintiff further reported that he is always inside the house and leaves only when necessary.[18] (Tr. 205.)

---

[18] Furthermore, in its recommendation that Plaintiff permanently retire due to physical disability, the U.S. Air Force Physical Evaluation Board noted:

> According to a recent evaluation, [Plaintiff] continues to struggle with symptoms of PTSD, which make it difficult for him to work. Although he is attempting to learn additional social skills, he only leaves the house for appointments. Currently, he attends an intensive outpatient program [] at the VA four days a week in addition to engaging in regular encounters with his individual therapist and psychiatrist. Overall, [Plaintiff] displays severe difficulties in social and occupational functioning, and has deficiencies in most areas such as school, family relations, judgment, thinking, and/or mood. His condition is unlikely to significantly improve or deteriorate. Based on this information, the Board finds [that] [Plaintiff] remains unfit for military service and recommends discharge with permanent retirement with a disability rating of 70%.

(Tr. 225.)

13

Furthermore, on July 23, 2018, Plaintiff left a post-traumatic residential rehabilitation program before completing the program. Contrary to the ALJ's explanation that Plaintiff left because "he did not feel he required that level of care" (Tr. 28), treatment notes indicate that Plaintiff left because he felt "more depressed since his admission to [the] residential program" due to "the lack of cleanliness [in] the unit, the lack of sufficient structure [,] and his belief that there are individuals in the program who 'are here for the wrong reasons'" (Tr. 753–54). Plaintiff stated that he could not "fit in well [] with the other [program participants]" (Tr. 757), and did "not want[] to stay in th[e] residential [program] [because] it is not for him" (Tr. 287). Although Plaintiff was discharged at his own request, a psychologist noted that he "continue[d] to experience very severe symptoms of PTSD including re-experiencing, avoidance and hyper-arousal." (Tr. 754.) As of July 23, 2018, Plaintiff had been taking nine total medications, including duloxetine for depression and PTSD, gabapentin for mood stability, prazosin at bedtime for nightmares, and quetiapine fumarate for mood stability, paranoia, and intrusive thoughts. (Tr. 288.) Plaintiff was prescribed psychiatric medication for three-and-a-half years as of June 2018 for depression and PTSD. (Tr. 300.)

Third, the ALJ determined that Plaintiff had only mild limitations in his ability to concentrate, persist, or maintain pace despite his general limitations in concentration because he was "able to drive, build classical guitars and violins, watch movies and play bingo." (Tr. 26.) However, Plaintiff noted in his function report that he has lost interest in his hobbies, and became prone to injuries because of poor concentration. (Tr. 206.) Furthermore, Plaintiff further reported that he feels as if his "brain shuts down and [he] can't remember simple things . . . [such as his] military rank." (Tr. 209.)

And fourth, the ALJ concluded that Plaintiff had no more than moderate limitations in his ability to adapt due to statements that Plaintiff can "handle self-care and personal hygiene," and the evidence indicating that Plaintiff "ha[s] appropriate grooming and hygiene and normal mood and affect." (Tr. 26.) As discussed above, however, Plaintiff's daily activities are severely limited, and he often requires assistance and reminders to take care of his personal needs. (Tr. 204.)

In light of the treatment notes, Plaintiff's medical history, and Dr. Vincent's psychological assessment, "the record evidence suggests that Plaintiff's symptoms *could* [very well] meet the Listing requirements," and the Court is thus "unable to assess whether the ALJ's decision is supported by substantial evidence." *Perozzi*, 287 F. Supp. 3d at 483 (emphasis added) (citation omitted); *accord Duran v. Colvin*, No. 14-CV-8677 (HBP), 2016 WL 5369481, at *17 (S.D.N.Y. Sept. 26, 2016) (remanding where the ALJ at step three "failed to fully address the medical evidence that potentially meets the listing requirements"); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 507–08 (S.D.N.Y. 2014) (finding that remand was appropriate where there was insufficient uncontradicted evidence in the record to support the ALJ's rationale at step three); *Norman v. Astrue*, 912 F. Supp. 2d 33, 41 (S.D.N.Y. 2012) (remanding where "the ALJ's failure to explain his reasoning and the conflicting medical evidence in the record" did not allow the court to "conclude by looking at 'sufficient uncontradicted evidence' that the ALJ's decision was supported by substantial evidence" (citation omitted)).

Accordingly, because the ALJ's step-three rationale contradicts with portions of Plaintiff's treatment notes and medical history and fails to consider the assessment of Dr. Vincent, the Court is unable to fathom the ALJ's rationale, and finds remand warranted on this basis. The Court notes that the ALJ was not required to set out why Plaintiff's impairments did not meet the requirements of Listings 12.04 and 12.15 in his step-three rationale so long as "other portions of [his] decision

and the evidence before him indicate[d] that his conclusion was supported by substantial evidence." *McIntosh*, 2018 WL 4376417, at *22 (quoting *Berry*, 675 F.2d at 468).  However, for the reasons discussed next, the Court finds that other portions of the ALJ's decision do not support either his step-three rationale or his conclusion that Plaintiff's mental impairments did not meet the Listing requirements.

## II.     The ALJ's RFC Determination

In his RFC determination, the ALJ considered Plaintiff's July 30, 2018 function report, a number of Plaintiff's treatment notes and records, and the opinions of Plaintiff's treating psychiatrist, a consultative examiner, a state agency medical consultant, and a non-examining medical expert.  (Tr. 27–30.)  With respect to Plaintiff's mental limitations, the ALJ noted that Plaintiff has been diagnosed with MDD and PTSD, but found that his "ability to perform a wide range of his activities of daily living and successful treatment indicate that [he] is not totally disabled." (Tr. 31.)  The ALJ concluded that the record supported that Plaintiff is "not more limited than to medium exertional work" with certain limitations.  (*Id.*)

The ALJ summarized treatment notes and records made by E. Kamin,[19] Ph.D., CE Herman, Dr. Vincent, and Jennifer Blitz, Psy.D.  (Tr. 30–31 (record citations omitted).)  The ALJ found "not persuasive" the opinion of Dr. Kamin, "persuasive" the opinion of CE Herman, "not persuasive" the opinion of Dr. Vincent, and "persuasive" the opinion of Dr. Blitz.  (Tr. 30–31.)  Based on this weighted consideration of the medical sources' opinions, the ALJ concluded that, while Plaintiff "has impairments that more than minimally impact his ability to engage in work related activities," the ALJ was "not persuaded that the degree of impairment renders him disabled." (Tr. 29.)  Plaintiff argues that, in arriving at his RFC determination, the ALJ erred with

---

[19] Only Dr. Kamin's first initial was included in the record.

respect to the weight he assigned to the opinions of Dr. Vincent and Dr. Blitz.  (Pl.'s Mem., Dkt. 9, at 24.)  The Court agrees for the reasons discussed below.

### A. Medical Source Evaluation

#### 1. New Regulations Regarding Weight to be Given Medical Source Opinions

Previously, the SSA followed the "treating physician rule," which required the agency to give controlling weight to a treating source's opinion so long as it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2).  The 2017 regulations changed this standard for DIB applications filed "on or after March 27, 2017."  *Id.* § 404.1520c. Under the new regulations, the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  *Id.* § 404.1520c(a).  Instead, when evaluating the persuasiveness of medical opinions, the Commissioner will consider the following five factors: (1) supportability; (2) consistency; (3) relationship of the source with the claimant, including length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and whether the relationship is an examining relationship; (4) the medical source's specialization; and (5) other factors, including but not limited to "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA] disability program's policies and evidentiary requirements."  *Id.* § 404.1520c(c).  Using these factors, the most important of which are supportability and consistency, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record."  *Id.* § 404.1520c(b).

With respect to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). While the ALJ "may, but [is] not required to, explain how [he] considered" the factors of relationship with the claimant, the medical source's specialization, and other factors, the ALJ must "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." *Id.* § 404.1520c(b)(2). However, where an ALJ "find[s] that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported [according to § 404.1520c(c)(1)] and consistent with the record [according to § 404.1520c(c)(2)] but are not exactly the same," the ALJ is required to "articulate how [he] considered the other most persuasive factors" for those opinions or findings. *Id.* § 404.1520c(b)(3).

> Even though ALJs are no longer directed to afford controlling weight to treating source opinions—no matter how well supported and consistent with the record they may be—the regulations still recognize the "foundational nature" of the observations of treating sources, and "consistency with those observations is a factor in determining the value of any [treating source's] opinion."

*Shawn H. v. Comm'r of Soc. Sec.*, No. 19-CV-113 (JMC), 2020 WL 3969879, at *6 (D. Vt. July 14, 2020) (alteration in original) (quoting *Barrett v. Berryhill*, 906 F.3d 340, 343 (5th Cir. 2018)); *see also Brian O. v. Comm'r of Soc. Sec.*, No. 19-CV-983 (ATB), 2020 WL 3077009, at *4

(N.D.N.Y. June 10, 2020) (noting that, notwithstanding the "eliminat[ion of] the perceived hierarchy of medical sources," the two most important factors of consistency and supportability "are the 'same factors' that formed the foundation of the treating source rule" (quoting Revisions to Rules, 82 Fed. Reg. 5844-01, at 5853)); *Barrett*, 906 F.3d at 343 ("[Examining physicians'] observations about an applicant's mental and physical condition are the first building block in the disability determination.  They are the primary source that medical consultants and vocational experts use to form their opinions.").  Because a treating source examines a claimant directly, they "may have a better understanding of [a claimant's] impairment(s) . . . than if the medical source only reviews evidence in [a claimant's] folder." 20 C.F.R. § 404.1520c(c)(3)(v); *see also Santiago v. Barnhart*, 441 F. Supp. 2d 620, 629 (S.D.N.Y. 2006) (noting in the context of the treating physician rule that "a physician who has a long history with a patient is better positioned to evaluate the patient's disability than a doctor who observes the patient once" (citation omitted)).

### 2.   Plaintiff's Medical Evaluations

#### a.   Dr. Robert Vincent

Dr. Vincent has served as Plaintiff's primary psychiatrist at the Northport VA Medical Center since 2013.  (Tr. 975.)  As discussed above, Dr. Vincent diagnosed Plaintiff with PTSD and chronic depression during the December 2018 assessment.  (*Id.*)  In support of this diagnosis, Dr. Vincent identified the following clinical findings: poor memory, sleep disturbance, personality change, mood disturbance, loss of intellectual ability of 15 IQ points or more, substance dependence, recurrent panic attacks, anhedonia[20] or pervasive loss of interests, feelings of guilt or worthlessness, difficulty thinking or concentrating, social withdrawal or isolation, blunt, flat or

---

[20] Anhedonia, "a common symptom of depression as well as other mental health disorders," "is the inability to feel pleasure."  *What Is Anhedonia?*, WEBMD, https://www.webmd.com/depression/what-is-anhedonia#1 (last visited Feb. 17, 2021).

inappropriate affect, decreased energy, intrusive recollections of a traumatic experience, and generalized persistent anxiety.  (Tr. 976.)  Dr. Vincent further indicated that Plaintiff was "markedly limited" in several work-related areas[21] within all four categories of mental functioning, and had experienced "deterioration or decompensation in work or work like settings which cause [him] to withdraw from that situation and/or experience exacerbation of signs symptoms."  (Tr. 978–80.)  Dr. Vincent explained that Plaintiff "can't work [and] can't follow through," and that Plaintiff was "[i]ncapable of even low [work] stress" due to his chronic PTSD.  (Tr. 980–81.)  Dr. Vincent opined that Plaintiff is "unemployable" and is likely to be absent from work more than three times a month as a result of his impairment or treatment.  (Tr. 982.)  Dr. Vincent expected that Plaintiff's impairments would last at least twelve months and were likely to produce both "good days" and "bad days."  (Tr. 981.)  At the time of this evaluation, Dr. Vincent indicated that Plaintiff "[was] at maximum improvement."  (Tr. 975.)

The ALJ discounted Dr. Vincent's opinion by concluding that it was "not consistent with or supported by the medical evidence," and that Plaintiff's "mental status examinations are consistently normal."  (Tr. 30.)  The Court finds this determination to be in error, and that Dr. Vincent's conclusions are supported by, and consistent with, other medical evidence.

---

[21] Specifically, Dr. Vincent indicated that Plaintiff was "markedly limited" in the following areas: remembering locations and work-like procedures; understanding and remembering one- or two-step instructions; understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule or maintaining regular attendance and being punctual within customary tolerance; working in coordination with or proximity to others without being distracted by them; completing a normal workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently.  (Tr. 978–80.)

As to supportability, Dr. Vincent based his opinion on (1) the results of a psychiatric exam conducted on December 28, 2018, (2) notes from treatment spanning "5 or 4 days/week in [a] PTSD program and 1 day [of] aftercare," and (3) his experience in treating Plaintiff since 2013. (Tr. 975.)  The Court finds that Dr. Vincent's extensive experience in treating Plaintiff and references to that experience in supporting his opinion serve as persuasive "supporting explanations" pursuant to 20 C.F.R. § 404.1520c(c)(1).

And as to consistency, Plaintiff's treatment notes from June 2018 indicate that he experienced trouble understanding, concentrating, or remembering. (Tr. 776–77.) Dr. Vincent's results are consistent with the findings of medical consultant Dr. Kamin, who opined that Plaintiff has moderate limitations in understanding, remembering, or applying information, as well as in concentrating, persisting, or maintaining pace. (Tr. 64.) A residual functional capacity assessment as to sustained concentration and persistence limitations found that Plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions (Tr. 66), to maintain attention and concentration for extended periods (Tr. 67), and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (*id.*). Dr. Kamin also found that, with respect to social interactions, Plaintiff was moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.*) Dr. Kamin also noted that Plaintiff's "memory remote skills [were] below average" and concluded that he "can do simple tasks." (Tr. 68.)

Furthermore, Plaintiff was admitted to the VA residential rehabilitation treatment program from June 14, 2018 to June 25, 2018 for suicidal ideations and depression. (*See* Tr. 279, 774.) Upon admission, Plaintiff stated that "[his] brain [wa]s going everywhere." (Tr. 569.)  In the

preceding week, "he ha[d] felt more hopeless, [had a] foreshortened sense of the future," and was "just tired of life." (*Id.*)  Plaintiff had become "more isolative to his garage, [had] decreased sleep ('feels like [he's] up for 3 days'), low concentration, low appetite, [and] anhedonia." (*Id.*)  During the period from June 14 to June 25, 2018, Plaintiff reported depression; anxiety; hallucination; trouble understanding, concentrating, and remembering; and that avoided people to prevent anger control issues.  (Tr. 452.)  Plaintiff also reported "problems in functioning, getting along with others, seeing shadows in the dark, feeling paranoid, sleep disorder, hypervigilan[ce], bad thoughts, irritability[,] and other symptoms of PTSD.  He reported that he drank excessively for one year . . . up to a quart of hard liquor in a day." (Tr. 450.)

A mental health diagnostic conducted on July 18, 2018 indicated that Plaintiff scored in the highest cluster of PTSD symptom severity with "very severe symptoms reported."  (Tr. 772.) Specifically, he responded "extremely" to, *inter alia*, the following inquiries: avoiding external reminders of the stressful experience, trouble remembering important parts of the stressful experience, loss of interest in activities that he used to enjoy, feeling jumpy or easily startled, and having difficulty concentrating.  (Tr. 772–73.)  In a suicide risk assessment on July 23, 2018, Plaintiff noted that he had ideation about suicide by hanging with no preparation (Tr. 285, 453), which the attending physician at the Northport VA Facility observed was consistent with previous risk assessments (Tr. 285–86).  The assessment also noted Plaintiff's isolation, given his then-recent discharge from the Air Force.  (Tr. 286.)

During an examination on August 3, 2018, Plaintiff "report[ed] having memory issues" that began seven to eight months prior.  (Tr. 735.)  "He report[ed] that he forgets names and what he did the day prior," and that he "use[d] a reminder to take his medications." (*Id.*)  At the end of August 2018, Plaintiff was admitted for alcohol use disorder associated with his PTSD and MDD,

and had an "increased baseline suicide risk." (Tr. 699.)  Plaintiff reported he "ha[d] been drinking everyday, [he] need[s] it to go out or do work around the house, [and] without it [he] ha[s] no motivation."  (Tr. 700–01; *see also* Tr. 700 (noting that Plaintiff had reported that "he had been drinking 1 liter of Tequila every day or every other day").)

In a spirituality group counseling session on September 19, 2018, Plaintiff "report[ed] his ongoing struggle with memory and the distress it causes him and his family." (Tr. 636.)  Treatment notes taken during a rehabilitation program session on October 5, 2018 show that while Plaintiff actively participated in the session, he felt concerned, "was semi-receptive to support, suggestions, and feedback," and "still ha[d] not attended self-help nor ha[d] an adequate weekend plan."  (Tr. 602.)  Most recently, on October 19, 2018, Plaintiff scored in the "moderate symptoms reported" cluster of the PTSD symptom severity test.  (Tr. 573.)  However, Plaintiff still reported extreme difficulty in concentration.  (Tr. 574.)

In light of the voluminous medical records consistent with Dr. Vincent's opinion as discussed above, the Court cannot find the ALJ's discounting of that opinion to be supported by substantial evidence.

### b.  Dr. Jennifer Blitz

In contrast to his evaluation of Dr. Vincent's opinion, the ALJ found the hearing testimony of medical expert Dr. Blitz to be "persuasive[,] as she had an opportunity to review the entire evidence of record" and her results were "consistent with and supported by the medical evidence of record." (Tr. 31.)  While Dr. Blitz reviewed Plaintiff's medical records from the Northport VA Medical Center, she never examined Plaintiff directly. (Tr. 41–42.)  Based on her review of the records, Dr. Blitz testified that Plaintiff had "moderate impairment[s]" in his ability to relate with supervisors, co-workers and the public (Tr. 40) and in adapting or managing himself (Tr. 41).  Dr.

Blitz found only a "mild limitation" in sustaining concentration based on the observation that Plaintiff's mental status examinations were within normal limits. (*Id.*)

The Court finds the ALJ's assessment of Dr. Blitz's opinion to be in error. As discussed above, Plaintiff's reported limitations, which are much more severe than in Dr. Blitz's assessment, are supported by and consistent with other medical evidence, including hospital records, treatment notes, psychiatric evaluations, and the opinions of both Drs. Vincent and Kamin. Furthermore, courts in this circuit long have casted doubt on assigning significant weight to the opinions of sources that are based solely on a review of the record. *See, e.g.*, *Piorkowski v. Comm'r of Soc. Sec.*, No. 18-CV-3265 (FB), 2020 WL 5369053, at *2 (E.D.N.Y. Sept. 8, 2020) ("[T]he general rule is that the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability." (quoting *Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990))).

Thus, the Court concludes that the ALJ erred in overvaluing Dr. Blitz's opinion and discounting Dr. Vincent's opinion to the extent that it conflicted with that of Dr. Blitz. *See Shawn H.*, 2020 WL 3969879, at *8 ("Generally, where, as here, there are conflicting opinions between treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" (quoting *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990))); *Roman v. Astrue*, No. 10-CV-3085 (SLT), 2012 WL 4566128, at *16 (E.D.N.Y. Sept. 28, 2012) (finding error where the ALJ assigned significant weight to the medical opinion of a non-examining medical expert). On remand, the ALJ should specifically analyze the consistency and supportability of Dr. Vincent's opinion as required by 20 C.F.R. § 404.1520c, and accord his opinion proper weight as compared to that of Dr. Blitz.

### B.        Plaintiff's Testimony

In assessing whether a claimant is disabled, "[t]he ALJ must follow a two-step process to evaluate a claimant's assertions of pain and other symptoms." *Cabassa v. Astrue*, No. 11-CV-1449 (KAM), 2012 WL 2202951, at *13 (E.D.N.Y. June 13, 2012). "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (alteration omitted) (quoting 20 C.F.R. § 404.1529(a)).

> The ALJ must consider statements the claimant or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts at work, or any other relevant statements [he] makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

*Villegas Andino v. Comm'r of Soc. Sec.*, No. 18-CV-1780 (PKC), 2019 WL 4575364, at *5 (E.D.N.Y. Sept. 19, 2019) (alterations omitted) (quoting *Genier*, 606 F.3d at 49).

The relevant regulations set out a seven-factor test to evaluate a plaintiff's own subjective statements regarding his symptoms.[22] *See* 20 C.F.R. § 404.1529(c)(3). "If the ALJ rejects plaintiff's [statements] after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing

---

[22] The seven factors are: (i) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate his pain or other symptoms; (v) treatment, other than medication, the claimant receives or has received for relief of his pain or other symptoms; (vi) any measures the claimant uses or has used to relieve his pain or other symptoms; and (vii) other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

court to decide whether there are legitimate reasons for the ALJ's disbelief." *Fernandez v. Astrue*, No. 11-CV-3896 (DLI), 2013 WL 1291284, at *18 (E.D.N.Y. Mar. 28, 2013) (quoting *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010)).

Here, the ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (Tr. 27.)  In discounting the credibility of Plaintiff's functional assessment, the ALJ reasoned that "he has been capable of performing a wide and varied range of activities of daily living," including dressing and grooming, gardening, attending group meetings, counting change, driving, going out alone, and attending programs at the Northport VA Medical Center. (Tr. 29.)

However, the Court finds that the ALJ selectively relied on reports of Plaintiff's daily activities without considering Plaintiff's limitations in performing those activities, such as needing reminders "to take care of [his] personal need[s]" (Tr. 204), leaving the house "only . . . if necessary" (Tr. 205), losing "interest [in his] hobbies" because he "became prone to injuries [due to] poor concentration" (Tr. 206), and having "no desire to be around others" because he "can't trust anyone" (Tr. 207).  Furthermore, on a suicide risk assessment and safety plan from September 4, 2018, Plaintiff indicated activities, such as walking during the early morning, listening to music, and going to church, were part of his coping strategies for his suicide safety plan. (Tr. 680–81.) These coping strategies should not be leveraged against Plaintiff to undermine his testimony about his general limitations. *Cf. Cabibi*, 50 F. Supp. 3d at 238–39; *Colon v. Astrue*, No. 10-CV-3779 (KAM), 2011 WL 3511060, at *14 (E.D.N.Y. Aug. 10, 2011) ("The Second Circuit has repeatedly recognized that '[a] claimant need not be an invalid to be found disabled.'" (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988))).  Finally, Plaintiff's consistently reported poor

concentration, inability to follow spoken or written instructions, and difficulty in remembering (*see* Tr. 209) are all consistent with evidence in the record, particularly the notes and findings of Drs. Vincent and Kamin.  The ALJ's reliance on Plaintiff's daily activities to discredit his statements of limited functionality is thus inappropriate in light of the record, and warrants remand for further consideration.

### CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion.  The Commissioner's decision is remanded for further consideration consistent with this Memorandum and Order.  The Clerk of Court is respectfully directed to enter judgment and close this case accordingly.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: February 18, 2021
      Brooklyn, New York

27